UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

EUGENE DAVIDSON, III and ENRICO
DAVIDSON,

        Defendants.

Case Number 21-20240
Honorable David M. Lawson

_____/

**OPINION AND ORDER DENYING MOTION FOR DISCLOSURE OF *BRADY*
MATERIAL OR FOR FURTHER RELIEF**

The defendants, charged with drug and firearm offenses, have filed a motion asking the Court to order the government to produce recordings from the body cameras worn by Detroit police officers during the execution of a search warrant that produced the incriminating evidence in this case. Those video recordings no longer exist. They were destroyed pursuant to the misapplication of a Detroit Police Department policy (no longer in effect) that called for such video evidence to be overwritten after a period of time. The Court held an evidentiary hearing, where it became apparent that the destroyed video and audio evidence likely was not materially exculpatory, and that the destruction was the result of police negligence or incompetence and not from bad faith. The Court, therefore, will deny the motion to compel production of the video footage that no longer exists and deny the defendants' request for other relief.

I.

On January 3, 2021, officers of the Detroit Police Department (DPD) executed a search warrant at the home of defendant Enrico Davidson. During the search, a loaded gun was found in the defendant's bedroom. The police also located cocaine, packaging material, and cash in the house. Both defendants were present in the home at the time of the search.

Enrico Davidson is a convicted felon. On March 3, 2021, Enrico was charged by state authorities with illegal gun possession. On April 7, 2021, Enrico was indicted by a federal grand jury on one count of possessing a firearm after having been convicted of a felony, contrary to 18 U.S.C. § 922(g)(1). The same indictment also charged co-defendant Eugene Davidson, III with possessing cocaine with intent to distribute, 18 U.S.C. § 841(a)(1), possessing a gun in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c) (apparently the same firearm that Enrico was charged with possessing), and being a felon in possession of a firearm. The felon-in-possession charges against both defendants included career criminal enhancements under 18 U.S.C. § 924(e)(1). On April 20, 2021, the state charges against Enrico Davidson were dismissed based on the presentment of the federal charges in this case.

The government represents that on April 14, 2021, ATF Task Force Officer Angela Bunch (also an officer of the DPD) requested a copy of the DPD case file "including all reports, search warrants, requests for laboratory analysis, and body-worn camera video," so that the file could be conveyed to the federal prosecutors in this case. However, when Officer Bunch received the file, it did not include any body camera videos. On May 4, 2021, Officer Bunch contacted DPD Sergeant Jeffrey Banks to inquire about the body cam recordings. Sergeant Banks told her "that the video had not been requested within the [90-day] retention period [established by DPD Manual Section 304.9] and therefore, [the video] was not downloaded to his department issued hard drive for production." The government asserts that because the video was not downloaded for retention, it was automatically deleted from DPD's video storage server 90 days after the search occurred (on or soon after Saturday, April 3, 2021).

The government says that, due to the automatic deletion, no body camera video presently exists to be produced. The government represents that DPD policy allows body camera footage

to be "flagged" for retention within the 90-day period, but it says that was not done in this case. The government does not explain why the video was not either downloaded for retention or "flagged" within the operative time period, after the state charges were filed on March 3, 2021.

At the evidentiary hearing, Karen Gagnier, a paralegal with the Wayne County prosecutor's office, testified that one of her jobs is to respond to defense attorneys' requests for evidence in pending cases. She received a request from Eugene Davidson's attorney (Todd Perkins) on March 24, 2021 for the evidence in the state prosecution. Gagnier, whose responsibilities are largely ministerial, searched for materials on the Evidence.com system and then sent a link to attorney Perkins on March 29, 2021. The linked materials consisted entirely of "paper discovery" materials, and they included everything that was available then on Evidence.com. No video evidence was included. The paper discovery generally is uploaded by employees of the prosecutor's office, but it comes from the DPD.

The officer in charge of the state prosecution was Jeffrey Banks, II, a sergeant with the DPD. He was part of the search warrant execution team. Banks described the department policy in effect at the time as a 90-day "retention period" for body camera footage. Under that policy, the video evidence from the January 3, 2021 search warrant execution would not be retained after April 3, 2021. (Banks explained that the policy now calls for "indefinite" retention.) However, if the evidence was "flagged," it would not be destroyed until someone authorized the deletion.

The Wayne County prosecutor authorized a complaint in the Davidson case on February 5, 2021. A "warrant" (Banks could not say if it was an arrest warrant or a search warrant) was entered into the LEIN system on March 3, 2021, 59 days after the search warrant execution. On March 26, 2021, Banks received an email from an assistant United States attorney asking about a contact by Banks with a federal Task Force Officer (TFO). The email indicated that Banks had

informed the TFO that DPD policy only specified that footage of a "breach" and entry during execution of a search warrant should be recorded by body cameras. Banks testified, however, that information "did not come from him," and that the DPD policy required recording of the entire warrant execution.

Banks received an email from Enrico Davidson's attorney (Cena Grey) on May 27, 2021, asking for body camera footage. He responded that same day stating only that "I don't have the body cam footage."

Banks explained that there were 16 police officers that participated in the raid on January 3, 2021, and all of them wore body cameras. Officers check out a camera in advance, and a record routinely is made of the serial numbers. After a shift, officers return the cameras to a "dock," where the footage is automatically uploaded to a system called Watch Guard. From there, the footage could be uploaded to Evidence.com, and it was Banks's responsibility to do that in this case. He said he could have uploaded the footage as early as January 4, 2021, but he did not do that because he did not have an indication that the case was proceeding to prosecution. He didn't learn that, he said, until May 4, 2021, when he found out that the case "was going to court." Banks admitted that he submitted the warrant request in April 2021, but he did not know "that the case was being charged federally" until May 4, 2021.

Banks conceded that he understood that if footage was not downloaded from Watch Guard it would be lost forever. And he also admitted that the case was "charged" against the defendants within 60 days after the warrant execution, but he "never was notified that the case was charged." Banks testified he would be notified about cases either by receiving a request from the Prosecutor's office or via emails from the court notifying him of the date for a preliminary examination. However, he never received a subpoena for any evidence in the Davidson case. Banks said there

were other instances where he was not notified that a case was charged within 90 days, and the Davidson case was "not an anomaly."

It was on May 4, 2021 that Banks received a request from the federal prosecutor, and that was when he searched for, but was unable to locate, body camera footage for this case. Banks knew that there was video footage from his body camera recorded on January 3, 2021, but after he found that the footage was no longer available on May 4, 2021, the only follow up action that he took was preparing a supplemental report on August 18, 2021 reciting the efforts he made to obtain the video footage.

Banks said that during the execution of the search warrant, he was the "raid commander" and the "rifleman," meaning he was one of the first officers to enter the house. When Banks entered a bedroom to the left upon entering the house, he saw defendant Enrico Davidson leaning over and placing an object on the ground. A female also was in the room, in bed when Banks entered. Banks ordered both persons to leave the room and lay down on the floor, and they were secured by other officers. Banks then returned to the bedroom, and at the spot where Davidson was spotted, Banks found a gun on the floor.

Banks admitted that his body camera would have captured his interactions with defendant Davidson. After the warrant execution, Davidson was arrested and transported. Banks and his team transported the arrestees to a prisoner processing facility, where any firearms also would be surrendered. Banks and his team then returned to the station house, where they logged in the body cameras, and the footage from them then automatically was uploaded into the Watch Guard system.

Banks agreed that DPD Policy Number 304.6-9, section (3) requires that discovery information relating to an ongoing investigation be preserved on a "separate media," but he said

that he has "no authority" to do that. The only things he could do were downloading video footage to his computer and uploading it to Evidence.com. Banks said the video footage was "preserved" in Watch Guard when the cameras were docked, but under the policy prevailing at that time, the footage only was copied to a "separate media" when a request was received from the Prosecutor. Banks understood that footage stored in Watch Guard only would be preserved for 90 days, and "if he didn't do something about it" within 90 days it would be lost. Banks conceded that he was aware that in January 2021, the DPD policy for 90-day retention of body camera footage would result in "systematic destruction" of footage if cases were not charged within 90 days.

Banks said that when he submitted a warrant request, he anticipated that charges would be forthcoming. And if he knew a case had been charged, he would have preserved the evidence even if a request was not forthcoming. However, Banks said that he never received any information that charges were brought. Banks conceded that the register of actions in the 36th District Court indicated that defendant Davidson was arraigned on March 3, 2021, which was less than 90 days after the warrant execution. But he testified that he never had any notice that the defendants were charged in state court and had not seen the register of actions before the hearing.

Art Thompson, the Chief Information Officer for the City of Detroit, testified that he was responsible for the origination and implementation of the DPD policy governing retention of body camera video footage that was in place in January 2021. Under the current policy, the DPD retains all video footage that may be evidence in a criminal case "indefinitely." But at the time, video footage from body cameras only was retained for 90 days.

Thompson said that the procedure for handling body cameras required each officer to "dock" the body camera upon returning to the station house, which would result in the footage automatically being transferred to a storage server. But in order to retain footage from body

cameras for more than 90 days, an officer would have to take the initiative to "export" the video from the body camera storage system to a separate storage medium. Thompson said that any time an incident was deemed to include evidence of a crime, the officer would be responsible for exporting and retaining relevant video footage. A trigger that would prompt an officer to save and retain footage would be, for example, if an incident would be followed up with prosecution, based on communication from the Wayne County Prosecutor's Office.

Thompson investigated how the video from the body cameras involved in this case had disappeared. According to his examination, the purge of the video footage was "normal" and was not accomplished by any unusual activity. He followed up with Watch Guard to see if there was "anything he was missing" or if any unusual activity had caused the video deletion. The analysis by the vendor showed that the deletion occurred through the "routine" process of purging footage after 90 days. The body camera system would "start a 90-day timer" when footage was uploaded. When the timer expired it would be deleted automatically.

Thompson also said that the vendor told him that the video footage could not be recovered from any "ghost files" or "unallocated storage" due to regular "defragmentation" of the storage space that would eliminate any traces of the data.

II.

The defendants argue that body camera footage from the execution of the warrant admittedly existed at one time, could be helpful to their defense, and therefore must be disclosed. And the defendants insist that if the government fails to produce it, the Court should issue an order "establishing the consequences for the failure to produce." The government responds simply that it cannot produce what it does not have. It also asserts that the video evidence would not be helpful to the defense, and its destruction was not motivated by bad faith.

It is well settled that "prosecutors must generally turn over [to the defense] material evidence favorable to a defendant." *Stockdale v. Helper*, 979 F.3d 498, 504 (6th Cir. 2020) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). That is because "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Hines v. Mays*, 814 F. App'x 898, 916 (6th Cir. 2020) (quoting *Brady*, 373 U.S. at 87). "The *Brady* rule applies to both exculpatory and impeachment evidence." *Ibid.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

"To establish a *Brady* violation, [the defendant must show] that: (1) the prosecutor suppressed evidence that was not known to the [defendant] and was not available from another source; (2) such evidence was favorable to the defense; and (3) the suppressed evidence was material." *King v. Winn*, No. 20-1521, 2020 WL 7062678, at *2 (6th Cir. Sept. 9, 2020) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

It is obvious here that no purpose would be served by an order compelling the government to produce the body camera recordings; the government cannot disclose what it does not have and cannot obtain. Moreover, it is generally accepted that the remedy for a *Brady* violation is a new trial. *United States v. Presser*, 844 F.2d 1275, 1286 (6th Cir. 1988) ("The decisions which have construed the *Brady* doctrine make it absolutely clear that the remedy for a *Brady* violation is a new trial."); *see Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (noting that when a defendant proves a *Brady* violation, they are "entitled to a new trial"). That relief would be pointless, here, though, since there has been no trial yet.

The defendants also ask the Court to establish unspecified "consequences" of the failure to produce the videos. In *Government of Virgin Islands v. Fahie*, the Third Circuit noted that "[w]hile

retrial is normally the most severe sanction available for a *Brady* violation, where a defendant can show both willful misconduct by the government, and prejudice, dismissal may be proper." 419 F.3d 249, 255 (3d Cir. 2005). Here, the defendants have not made any factual presentation or mounted any argument to demonstrate that the government engaged in culpable, bad faith conduct that would support more severe sanctions.

The Sixth Circuit has explained that when faced with the destruction of evidence by the government, courts must consider two lines of authority. *United States v. Collins*, 799 F.3d 554, 569 (6th Cir. 2015). The first follows *California v. Trombetta*, 467 U.S. 479 (1984), and is applied when the destroyed evidence is materially exculpatory. To qualify, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. In such cases, "[t]he destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith." *Collins*, 799 F.3d at 569 (quoting *Unites States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.*

The second line of authority follows *Arizona v. Youngblood*, 488 U.S. 51 (1988), and "applies in cases where the government fails to preserve 'potentially useful' evidence." *Ibid.* (citing *Wright*, 260 F.3d at 570). Under that rubric, the defendants must show that the government acted in bad faith when it destroyed the evidence, the exculpatory value of the evidence was apparent to the government before it was destroyed, and the defendants would be unable to find a

reasonably available substitute. *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (citing *Youngblood*, 488 U.S. at 57-58). "Bad faith" equates to "official animus or a conscious effort to suppress exculpatory evidence." *Collins*, 799 F.3d at 569 (quoting *Jobson*, 102 F.3d at 218).

The defendants cannot prevail under either line of authority. They have not identified anything that might appear in the video footage that could be helpful to their cases. Conspicuously, the defendants do not cite any testimony presented at the hearing suggesting plainly that they did not possess the firearm that was recovered incident to his arrest. Enrico Davidson concedes that one of the officers on the scene testified that he saw the defendant put an "unknown object" "on the floor" in the room where he was arrested. He also concedes that a gun later was found lying on top of a bag beside the bed that was adjacent to the defendant's position when arrested. He does not, however, cite any testimony by himself, by officers on the scene, or by anyone else clearly attesting that he did not in fact possess the gun in question, or that it was "planted" by anyone else on the scene. Instead, the defendants' brief merely states (without citing any evidence), only that the "defendant has consistently indicated that he NEVER placed an object on the floor." "Indications," however, are not evidence. The defendants here have offered nothing more than speculation about what any body camera video would have shown if it had been obtained by them.

Nothing in this record supports that idea that the destroyed video footage contains evidence that is materially exculpatory. And there is nothing to support a claim that the police acted in bad faith. Certainly, the testimony has established that the DPD was in the habit, prior to this prosecution, of systematically mishandling body camera video footage in a way that was at least glaringly incompetent in its tendency to destroy potentially exculpatory video records. There is

no doubt that the evidence should have been "flagged" for preservation. But a series of missteps that resulted in the triggering information not making it to the officer in charge of the case is what caused the footage to be overwritten by the application of a misbegotten policy that since has been rectified. The picture painted here is one of negligence, even gross negligence. But it does not amount to "official animus or a conscious effort to suppress exculpatory evidence." *Collins*, 799 F.3d at 569.

### III.

The failure to preserve the video recordings in this case certainly appears to result from incompetence, but the defendants have not shown that the footage contained materially exculpatory evidence or that the government acted in bad faith.

Accordingly, it is **ORDERED** that the defendants' motion to compel disclosure of *Brady* material or for other relief (ECF No. 25, 28, 43) is **DENIED**.

It is further **ORDERED** that the parties shall appear in court on **January 10, 2023 at 2:00 o'clock p.m.** to discuss further case management deadlines.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:   December 29, 2022